# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs January 16, 2013

## STATE OF TENNESSEE v. EUGENE M. HOGBIN

**Appeal from the Circuit Court for Cheatham County**
**No. 15924      George Sexton, Judge**

**No. M2012-00945-CCA-R3-CD - Filed March 26, 2013**

A Cheatham County Circuit Court jury convicted the defendant, Eugene M. Hogbin, of two counts of aggravated sexual battery. The trial court imposed an effective sentence of 20 years' incarceration. On appeal, the defendant challenges both the length and the alignment of the trial court's sentencing determination. Discerning no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and PAUL G. SUMMERS, SR. J., joined.

J. Steven Stack, Assistant District Public Defender (on appeal), and Kate Dyer, Pleasant View, Tennessee (at trial), for the appellant, Eugene M. Hogbin.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Dan Mitchum Alsobrooks, District Attorney General; and Robert S. Wilson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Deputy Sheriff Thomas Royal testified that on October 30, 2009, he went to the defendant's Cheatham County residence in response to a telephone call requesting a welfare check on the victim, S.G.[1], the defendant's ten-year-old stepdaughter. Upon arrival, Deputy Royal spoke with both the defendant and the defendant's wife, Juanita Hogbin. Deputy Royal determined that the defendant was not under the influence of any alcohol or drugs, and he proceeded to provide him with *Miranda* warnings. After being informed of

---

[1]To protect the anonymity of the minor victim, we refer to her only by her initials.

his rights, the defendant provided a written statement, which indicated that the victim does inappropriate things to him and that earlier that same evening, she had scratched him on his penis "by accident with her nails" and that she "pulls [his] pants a lot and hits" his penis. Upon further questioning by the deputy, the defendant admitted that he enters the bathtub with the victim in order to assist her in washing her hair. The defendant also stated that the victim had once "pulled his pants down while he was making dinner and slapped his penis around." The defendant then described an incident to the deputy wherein the victim had sat down next to him on the sofa, pulled down his pants, and "began jacking him off" until he ejaculated. The defendant indicated that these incidents had occurred over the past three months while his wife was at work.

The defendant told Deputy Royal that, prior to the deputy's arrival that evening, he was in the bathtub with the victim assisting her with washing her hair, and the victim had kicked him. The defendant explained that he was wearing shorts and that the victim's foot "went up under his shorts and cut his penis, her toenail did, causing [his penis] to bleed." After applying cream to the cut, the defendant reentered the bathtub, at which point he stated that the victim grabbed his penis and pulled him toward her.

Deputy Royal notified the Department of Children's Services, and the victim was removed from the defendant's residence. The victim was placed in the custody of her half-sister, Holly Cart.

Holly Cart, age 30, and the daughter of Juanita Hogbin, testified that the Department of Children's Services placed the victim with her on October 31, 2009, and that she was the victim's legal guardian. Ms. Cart testified that the victim had "adjust[ed] really well" since moving in with her. She further stated that the victim was very shy around men and that she had never acted out in any sexual manner.

The victim testified that the defendant began sexually abusing her in August 2009 and that the abuse continued through October 2009. She stated that the defendant repeatedly touched her chest and her vagina with his hands and that he touched her vagina with his penis "lots" of times. The victim testified that, although the defendant came close to inserting his penis in her vagina, the defendant told her that her vaginal opening was too small. According to the victim, the defendant asked her to massage his penis, which he referred to as his "lollipop," on two or three occasions. The defendant would direct the victim to apply lotion to her hands prior to these massages, which would last for two to three minutes, he would tell her that it "[felt] nice," and "white stuff [would] come out." The victim would tell the defendant to stop, and she stated that sometimes he would stop and other times he would not. The victim testified that, on one occasion, the defendant rubbed her vagina in a circular manner. These instances of abuse would occur three or four times

a week in the evenings when the victim's mother was at work.

The victim testified that, when she would take baths, the defendant would often get into the bathtub with her and that he would not be wearing any clothes. She would tell the defendant to get out, but he would not comply. On the final evening that the defendant entered the bathtub with the victim, she became angry at him and kicked her foot toward him, causing her toenail to scratch his penis.

The victim stated that when the abuse began, she was scared and "didn't know what would happen to" her. Eventually, the victim told a friend of hers about the abuse, and the friend's mother contacted the victim's father.

Cheatham County Detective Shannon Heflin testified that he and Lisa Helle of the Department of Children's Services arrived at the defendant's residence on the evening of October 30, 2009, and spoke first with the victim and then with the defendant. The victim told them that the defendant had touched her chest and vagina with his hands. She further stated that the defendant had asked her to massage his penis with lotion on her hands and that something white had come out. The victim said that the defendant had twice gotten into the bathtub with her and that the defendant had previously touched her vagina with his hands using a circular motion. When Detective Heflin spoke with the defendant, he told the detective that the victim had "tried twice to jack him off on the couch" and that on one of those occasions he had ejaculated a small amount. The defendant did admit to the detective that he had gotten into the bathtub with the victim on two separate occasions while he was naked.

B.T., a close friend of the victim, testified that she was sexually abused when she was younger. When B.T. was in the fourth grade, she told the victim about the abuse. At some point after that, the victim confided in B.T. that she was also being sexually abused by her stepfather. B.T.'s mother, Kathleen Tate, also testified. She stated that she adopted her daughter from Guatamala when she was six years old and that B.T. suffered the sexual abuse while she was in the foster care system. After she learned from her daughter that the victim was being abused, Ms. Tate encouraged B.T. to tell the victim to inform a family member. Eventually, Ms. Tate contacted the victim's father because she could see that the victim was terrified of the defendant.

Clarence Griggs, the victim's father, testified that when he received the phone call from Ms. Tate about the suspected abuse of the victim, he immediately asked his son, Michael Griggs, to contact the sheriff's department. Michael Griggs also testified and verified that he contacted the Cheatham County Sheriff's Department at the request of his father.

Juanita Hogbin, the defendant's wife and mother of the victim, testified that she and the defendant were married on June 7, 2008. The victim resided with the defendant and Ms. Hogbin, and the victim had visitation with her father, Clarence Griggs, every other weekend. Ms. Hogbin stated that the victim began acting out in a sexual manner beginning "somewhere around August" of 2009. She stated that, once, the victim removed her swimsuit while she was in the swimming pool with the defendant and that the victim once pulled down the swim trunks of the defendant while in the pool. Ms. Hogbin testified that on another occasion, the victim walked around naked in front of the defendant and her, following a shower. With respect to the defendant and the victim's being in the bathtub together, Ms. Hogbin stated that the victim would ask the defendant to help her remove soap from her eyes while washing her hair. Ms. Hogbin assumed that the defendant was wearing clothes when he assisted the victim in the bathtub. Ms. Hogbin testified that, until the evening that the victim was removed from her home, the victim had never told her about any of the abuse. Ms. Hogbin stated that she believed the defendant was innocent.

Eric Lockert, a pharmacist, testified about the defendant's medication profile from a hospital discharge form dated December 8, 2009, as well as from a patient history form from a local pharmacy listing the defendant's prescriptions from January 2009 through February 18, 2010. Mr. Lockert testified about the different medications and their functions, but he could not testify why the medications were prescribed for the defendant or how the defendant would have reacted to them.

The defendant testified that, initially, he had a good relationship with the victim, but in June 2009, the victim's attitude changed. He stated that she became "rude and obnoxious and vindictive" and that she would hit or kick him in the penis approximately twice each month. He testified that on two separate occasions, the victim took off her swimsuit and swam naked in their swimming pool, and once, the victim ripped off the defendant's swim trunks. On two other occasions, the victim disrobed in the house and ran around naked until either the defendant or Ms. Hogbin forced her to get dressed.

Over the course of the summer, the defendant would often help the victim rinse the soap out of her hair while she was taking a bath. The defendant stated that the victim frequently got soap in her eyes and would yell for the defendant to help her. He testified that he was always wearing boxer shorts when he went to help her and that he never got into the bathtub with the victim while he was naked.

With respect to the evening of his arrest, the defendant testified that he was assisting the victim in rinsing her hair and while "goofing off and carrying-on in the Jacuzzi," she kicked her feet up into the air and one foot "went up . . . [his] pant leg," causing her toenail to scratch his penis. The defendant stated that he was angry at the victim but that he

later returned to the bathroom to finish assisting her in rinsing her hair.

According to the defendant, he then fell asleep on the couch and woke up a short time later to the victim's "messing around with [his] penis" until he ejaculated. The defendant testified that, because the room was dark, his face was covered with a pillow, and the victim was wearing Ms. Hogbin's robe and perfume, he believed that it was his wife who was touching him. He estimates that the incident lasted approximately five minutes, at which time he removed the pillow from his face and saw the victim. He testified that the victim began giggling and ran out of the room. The defendant "hollered" at her and ordered her to go to bed. The victim then informed the defendant that the basement had flooded, and he went to the basement to begin cleaning up the water. Ms. Hogbin arrived home from work a short time later. The defendant stated that he was so preoccupied by the flooding that he did not think to tell his wife about what the victim had done to him.

Shortly after midnight, the defendant, who was still in the basement cleaning up the water, received a telephone call alerting him that members of the Cheatham County Sheriff's Department were at his front door. When he opened the door, the officers informed him that they were there to check on the welfare of the victim. The defendant showed the officers to the victim's bedroom, where the officers spoke with the victim briefly. The officers then separated the defendant and Ms. Hogbin and interviewed them both individually. The defendant testified that he did not realize at that time that he was suspected of any wrongdoing. He gave a statement to the officers, in which he stated that the victim acted inappropriately toward him, specifically mentioning the incident earlier in the evening in which the victim scratched his penis with her toenail and stating that the victim often pulls his pants down and hits his penis. The defendant concluded his statement with a request to officers to "[p]lease be kind and easy on her." The officers left the defendant's home around 5:00 a.m. on October 31.

Later that same morning, the defendant was asked to come to the Sheriff's Department to speak with officers there. The defendant complied and gave a second statement, in which he told the officers that the victim "had jacked [him] off once." Subsequently, the defendant was placed under arrest.

With respect to his physical and mental health, the defendant testified that, in the summer of 2009, he was taking 16 or 17 different medications and that the medications made him drowsy and affected his judgment. Sometime during that same summer, he underwent surgery to repair a triple hernia in his left testicle. The defendant also testified that he suffered from post-traumatic stress disorder following his service in the military during the Persian Gulf War.

With this evidence, the jury convicted the defendant on two of the three charged counts of aggravated sexual battery.[2] At sentencing, the trial court imposed a ten-year sentence for each conviction and ordered the sentences to be served consecutively, resulting in a total effective sentence of 20 years. On appeal, the defendant challenges the trial court's decision to sentence him to ten years' incarceration for each offense, rather than the minimum sentence of eight years, as well as the trial court's imposition of consecutive sentences. The State contends that the record supports the trial court's sentencing determination.

Since the passage of the 1989 Sentencing Act, our standard of review when considering challenges to the length and manner of service of a sentence has been de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006) ("When reviewing sentencing issues raised pursuant to subsection (a), including the granting or denial of probation and the length of sentence, the appellate court shall conduct a de novo review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct."). In 2005, the general assembly amended the Sentencing Act to bring our sentencing law into compliance with federal constitutional requirements as enunciated in *Blakely v. Washington*, 542 U.S. 296 (2004), and its progeny. Notably, the 2005 revisions rendered advisory the enhancement and mitigating factors and removed the presumptive sentence to be imposed by the trial court. *State v. Carter*, 254 S.W.3d 335, 345-46 (Tenn. 2008). In a number of cases following passage of the 2005 amendments, our supreme court signaled that the statutorily prescribed standard of review, de novo with a presumption of correctness, might be at odds with what had become a far more discretionary sentencing scheme. *See, e.g.*, *Carter*, 254 S.W.3d at 344, 346. In *State v. Cross*, 362 S.W.3d 512 (Tenn. 2012), the court again wrestled with the "the precise metes and bounds of appellate review under the current increased trial court discretion structure" but ultimately left the issue unsettled. *State v. Cross*, 362 S.W.3d 512, 529 (Tenn. 2012). The court visited the issue most recently in *State v. Bise*, and ultimately concluded that "although the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper

_____

[2]Count one of the indictment against the defendant charged him with committing aggravated sexual battery against the victim during the month of August 2009. Counts two and three leveled the same charges against him during the months of September and October 2009, respectively. The jury found the defendant not guilty on count one, and guilty as charged on counts two and three.

application of the purposes and principles of our Sentencing Act." *Id.* The court held that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness'" afforded to sentencing decisions of the trial court. *Id.* at 708.

The supreme court observed, however, that in making its sentencing decision, a trial court must consider the principles of sentencing enumerated in Code section 40-35-210(b):

> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
>
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

*see Bise*, 380 S.W.3d at 698 n.33(citing T.C.A. § 40-35-210(b)), 706 n.41. By statute, the trial court must also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)).

Thus, under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

First, we note that the record reflects the trial court's consideration generally of the evidence presented at both trial and the sentencing hearing, the presentence report, sentencing principles, the nature of the criminal conduct, evidence offered by the parties, and mitigating and enhancement factors. As Class B felonies, these aggravated sexual battery convictions are subject to a sentencing range of a minimum of eight years and a maximum of twelve years. *See* T.C.A. § 40-35-112(a)(2). In arriving at a sentence of ten years for each conviction, the trial court found a single enhancement factor: that the defendant had abused a position of private trust. *See* T.C.A. § 40-35-114(14). The court appears to have found the existence of one mitigating factor: that the defendant's criminal conduct did not cause or threaten serious bodily injury. *See* T.C.A. § 40-35-113(1). However, the trial court found that "the abuse of the position of trust outweighs the mitigating factor," and accordingly, the court found "the appropriate sentence to be ten years in this case." In our view, the record supports the trial court's findings. The defendant was the stepfather of the ten-year-old victim, and in that position, he was entrusted with caring for her during those times when the victim's mother was at work. He abused that position of trust by sexually assaulting the victim during those hours. We conclude that the record supports the length of each sentence imposed in this case.

When a defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentence to be served consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. They are:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). The existence of a single category is sufficient to warrant the imposition of consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997).

However, "[s]entences shall be ordered to run concurrently if the criteria noted in [Tennessee Code Annotated section 40-35-115(b)] are not met, unless consecutive sentences are specifically required by statute or the Tennessee Rules of Criminal Procedure." *Id.* § 40-35-115(d). The operative language of Code section 40-35-115(b)(5) originated in *State v. Taylor*, 739 S.W.2d 227 (Tenn. 1987), and was later codified in the 1989 Sentencing Act. In *Taylor*, our supreme court cautioned "that consecutive sentences should not routinely be imposed in sexual abuse cases . . . and that the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved." *Id.* at 230. Similarly, the Sentencing Act provides that "[e]very defendant shall be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." *Id.* § 40-35-102(1). Moreover, Code section 40-35-103 provides that sentences "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(2), (4). In *Gray v. State*, 538 S.W.2d 391 (Tenn. 1976), our supreme court held that consecutive sentencing should only be imposed after a finding that extended confinement "is necessary to protect the public from further criminal conduct by the defendant." *Id.* at 393. The holding in *Gray*, like that in *Taylor*, was later codified in the 1989 Act.

In applying Code section 40-35-115(b)(5), the trial court failed to make the requisite statutory findings. The trial court based its imposition of consecutive sentences upon its finding that the defendant was "convicted of two or more statutory offenses involving the sexual abuse of a minor, and considering the aggravating circumstances arising from the relationship between the defendant and the victim," without any further analysis of the considerations enumerated in that factor. *See* T.C.A. § 40-35-115(b)(5). Because the record fails to demonstrate that the trial court properly considered all relevant factors, the trial court loses the benefit of the presumption of correctness, and we must now conduct a purely de novo review of the sentencing alignment.

As previously noted, the record supports a finding of aggravating circumstances arising from the relationship of stepfather and stepdaughter, given the defendant's role as caretaker of the victim. As to the extent of the victim's residual physical and mental damage, no evidence established physical damage, but the victim impact statement prepared by Holly Cart, the victim's guardian, shows evidence of residual mental damage. In that statement, Ms. Cart stated that the victim "has struggled with guilt through this process" and "often asks if she's in trouble." The victim "has no desire to see [the defendant] again; the thought of being near him makes her nervous to the point of being sick at her stomach." The guardian stated that the victim continues to undergo therapy with a counselor who specializes in sexual abuse injuries and that she struggles with trusting other people.

Next, we turn to the time span of the undetected sexual abuse, which was relatively short. The jury found that it only spanned the months of September and October 2009. However, the record reflects that there were multiple instances of sexual abuse that occurred during the months of August, September, and October 2009. When the victim was asked at trial how many times the defendant had touched her "privates" (which she had previously identified as her vagina) with his penis, the victim responded that it happened "lots" of times. On at least one occasion, the defendant came close to penetrating her with his penis, but he told the victim her vaginal opening was too small. The victim testified that the defendant always touched her underneath her clothes and that the defendant was always naked when he would get into the bathtub with her, which was practically every night. On two or three occasions, the defendant directed the victim to put lotion on her hands and massage his penis until he would ejaculate, and there was one instance of the defendant's rubbing the victim's vagina in a circular manner. The victim testified that these instances of abuse occurred three or four times a week between August and October 2009. The sheer number of these sexual acts is enough for this consideration of time to weigh against the defendant. Moreover, upon our de novo review, this evidence reflects the nature of the sexual conduct is far worse than that of which the defendant was actually convicted.

The defendant relies on this court's opinion in *State v. Raygan L. Presley*, No. M2007-02487-CCA-R3-CD (Tenn. Crim. App., Nashville, August 18, 2008), to support his position that consecutive sentencing is not warranted in this case. However, *Presley* is easily distinguishable from the instant case. The defendant and his victim were stepfather and stepdaughter, but that is where the similarities end. *State v. Raygan L. Presley*, No. M2007-02487-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Nashville, August 18, 2008). Only three distinct instances of sexual abuse (specifically, touching or rubbing the victim between the legs) occurred over a period of a few weeks. *Id.* at 2. No victim impact statement was offered at trial, and virtually no evidence of residual physical or mental damage to the victim was shown. *Id.* at 10. Perhaps most importantly, the defendant in *Raygan L. Presley* was examined by a psychologist and certified sexual offender service provider, and the doctor testified that his tests revealed that the defendant could not be categorized as a pedophile and that the defendant was at a low-risk for re-offending. *Id.* at 7. On the basis of all of this evidence, this court vacated the trial court's order of consecutive sentencing and modified the judgment to reflect concurrent sentences. *Id.* at 11.

Our de novo review in the instant case leads us to conclude that the caretaker relationship between the defendant and the victim, the frequency and the multiplicity of the sexual abuse and the residual mental damage to the victim all weigh against the defendant. Therefore, we hold that consecutive sentence alignment is appropriate in this case.

Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE